#29552-r-JMK
**2022 S.D. 80**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

| | |
|---|---|
| TERRY ENDRES, | Plaintiff and Appellant, |
| v. | |
| GREGORY ENDRES, individually and as Co-Trustee of the Endres Family Trust; DONALD ENDRES, as Co-Trustee of the Endres Family Trust; CAROL WATERS, as Co-Trustee of the Endres Family Trust; JUDY ENDRES (fka Judy Zeiger), as Co-Trustee of the Endres Family Trust; and RUTH PARKHURST, as Co-Trustee of the Endres Family Trust, | Defendants and Appellees. |

| | |
|---|---|
| GREGORY ENDRES, | Plaintiff and Appellee, |
| v. | |
| TERRY ENDRES, | Defendant and Appellant, |
| and | |
| DONALD ENDRES, GREGORY ENDRES CAROL WATERS, JUDY ENDRES (fka Judy Zeiger), JANET ENDRES and RUTH PARKHURST, in their capacity as Co-Trustees of the Endres Family Trust, | Defendants and Appellees. |

IN THE MATTER OF THE
ENDRES FAMILY TRUST.

* * * *

ARGUED
OCTOBER 5, 2021
OPINION FILED **12/28/22**

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
ROBERTS COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE SCOTT P. MYREN
Judge

* * * *

RONALD A. PARSONS, JR.
PAMELA R. REITER
SHANNON R. FALON of
Johnson, Janklow, Abdallah
    & Reiter, LLP
Sioux Falls, South Dakota          Attorneys for appellant Terry
Endres.


ALEX HAGEN of
Cadwell, Sanford, Deibert
    & Garry, LLP
Sioux Falls, South Dakota          Attorneys for appellee Janet
Endres.


JASON R. SUTTON
THOMAS WELK of
Boyce Law Firm, LLP
Sioux Falls, South Dakota          Attorneys for appellees Donald
Endres, Carol Waters, Judy
Zeiger, and Ruth Parkhurst.


JOE ERICKSON
LEE SCHOENBECK of
Schoenbeck Law Office, P.C.
Watertown, South Dakota          Attorneys for appellee Gregory
Endres.

KERN, Justice

[¶1.]        James (Jim) Endres through a Declaration of Trust created the irrevocable Endres Family Trust (Trust) in March 1992, designating his seven children as beneficiaries: Gregory Endres, Donald Endres, Ruth Parkhurst, Carol Waters, Judy Endres, Terry Endres, and Janet Endres.  Jim served as the sole trustee.  The Trust was twice modified after its formation, primarily changing the trustees and procedures for governance.  In 2009, Jim's second wife and step-mother of the beneficiaries, Maxine Endres, was designated as co-trustee of the Trust with Jim.  Due to Jim's failing health, he and Maxine were removed as co-trustees in May 2016, and Jim's seven children were designated as co-trustees.

[¶2.]        In 2017, Terry Endres commenced litigation seeking court supervision of the Trust and to remove five of the co-trustees for breach of fiduciary duties.  Several additional lawsuits were filed by co-trustees and various claims, cross-claims, and counter-claims ensued.  Based upon a stipulation by the parties, the circuit court consolidated all proceedings into one action in Roberts County.  The consolidated case was eventually resolved through a global settlement, except for Terry's application for attorney fees, which was preserved as an issue to be decided by the circuit court.  Terry moved for $389,121.12 in attorney fees, expenses, sales tax, and interest,[1] arguing that he was entitled to attorney fees in his capacity as a co-trustee and as a beneficiary of the Trust.  The circuit court denied Terry's request, and he appeals.  We reverse and remand.

---

1.    Terry requested $343,474.20 in attorney fees, expenses, and applicable sales tax, along with interest in the amount of $45,646.92.

## Facts and Procedural History

[¶3.] The corpus of this Trust was comprised of nearly 1,900 acres of Jim's farmland valued in excess of $10 million, located in Grant, Roberts, and Codington Counties. The Trust had two primary sources of income: (1) rental income from tenants farming the Trust's land; and (2) payments to the Trust under the United States Department of Agriculture's (USDA) Conservation Reserve Program (CRP). "Under the terms of the Trust, Donald, Gregory, and Terry were each entitled to receive 20%" of the income earned from the Trust's assets. "Ruth, Carol, Judy, and Janet were each entitled to receive 10% of the income." The Trust would endure until the last of the brothers died or until written direction to terminate was given by them or the survivors among them. Upon termination of the Trust, each sibling would receive a distribution of principal from the Trust corresponding to his or her income percentage.

[¶4.] The circuit court entered an order modifying the Trust (First Modification) in September 2009, designating Maxine, as a co-trustee. Other than changing the trustee designation, minimal changes were made by the First Modification, none of which affect the current proceedings.

[¶5.] In October 2009, Jim, acting as trustee, entered into two agricultural lease agreements with Gregory Endres. Pursuant to the written leases, Gregory would rent specific parcels of Trust property in Grant and Roberts Counties allowing him to farm some of the Trust's irrigated land. The leases indicate that the rent for the irrigated acres was set at $100 and $95 per acre which was significantly below fair market value. Further, the leases were for five crop years,

commencing with the execution of the lease and ending on December 1, 2014. Following the initial five-year term, the leases would automatically renew each year unless Gregory gave notice of nonrenewal before December 1 of the year preceding the crop year for which the renewal was effective. The leases would terminate "December 1 of the year in which the Trust's real property [became] distributable under the Declaration of Trust or after 20 years" from their commencement (December 2030), whichever occurred first.

[¶6.] Jim also entered into an agreement with Terry that allowed him to farm Trust property located in Codington County. In addition, Jim loaned Terry Trust funds, with the arrangement memorialized by a Promissory Note (Note) in March 2011. The Note, which authorized a loan of up to $334,600, was due in full to the Trust on or before March 30, 2016.

[¶7.] In the spring of 2016, Jim, Maxine, and all beneficiaries requested a second order modifying the Trust (Second Modification). The circuit court granted the modification on May 9, 2016, which removed Jim and Maxine as co-trustees, replacing them with each of Jim's seven children who were designated as co-trustees. The Second Modification also included new procedures for governance, creating a board of co-trustees with the power to act as authorized under Section 5.1.1, which provided:

> A vote of a majority (50% or more) of the Co-Trustees shall be required:
>
> > 5.1.1.1 For election of a chair-person and other officers or representatives of as determined by the Co-Trustees;
> >
> > 5.1.1.2 For approval of lease agreements, including leases with one or more Co-Trustees;

5.1.1.3 For approval of all legal and accounting services; and

5.1.1.4 Except as required by paragraph 5.1.2 below, for the transaction of any other business relating to the Trust.

[¶8.]    Section 5.1.2, apart from leasing, required a super majority vote to convey or distribute land. The Second Modification further required the co-trustees to meet annually.

[¶9.]    Despite two modifications, Article 10 of the Declaration of Trust remained unchanged. Article 10 sets forth powers held by the Trustee as follows:

10.1    Additional Trustee Powers. Trustee shall have the power and authority to do any act or thing reasonably necessary or advisable for the proper administration and distribution of the trusts created by this instrument . . . .

A.    Trustee shall have all powers described in SDCL 55-1A-5 through 55-1A-36, inclusive as permitted by South Dakota Codified Laws 55-1A-3.

[¶10.]   As required by Section 5.1.1.1, the co-trustees met to elect officers, selecting Donald to serve as president/chairman of the Board. As president, he was granted "authority to conduct the day-to-day business of the Trust," including the ability to modify and execute rental agreements and the authority, if approved by the co-trustees, to amend Trust agreements. Throughout the duration of the Trust, the co-trustees held numerous meetings. Donald alleged in his affidavit that the Board memorialized every action taken through written minutes or by an email confirming any action taken by the co-trustees.

[¶11.]   Shortly after the Second Modification, the co-trustees, along with Jim and Maxine, discussed "terminating the trust and transferring its assets and debt

to a limited liability partnership (LLP)." It appears the co-trustees considered the LLP structure beneficial for tax purposes, to terminate Gregory's leases, and to distribute certain Trust land to Terry. Although all co-trustees participated in initial discussions regarding formation of the LLP, Terry and Janet opposed terminating the Trust and forming an LLP, and the Trust's assets and debts were never transferred.

[¶12.] In December 2016, Gregory signed eight CRP contracts, placing the Trust's CRP payments in his name.[2] Under this arrangement, Gregory as "tenant" would pay all CRP proceeds he received to the Trust as part of his rent. Donald testified in his deposition that all co-trustees were aware of this plan, although there are no meeting minutes or emails reflecting this agreement. Terry, however, asserted that many of the Board's actions were not memorialized in writing, including this agreement with Gregory. Terry claimed that he did not know about this plan with Gregory and that it was not until after he told Donald about the problems with the CRP payments that Donald acted, changing the CRP contracts to designate the Trust as payee. Gregory never received a CRP payment, and the Trust did not incur any penalties or fines relating to the CRP.

[¶13.] In July 2017, Terry brought the first of several lawsuits challenging the way in which the Trust was being managed. Terry filed a petition in Codington County for court supervision of the Trust and to remove Donald, Gregory, Judy,

---

2. Donald claimed that he had authority, as chairman/president of the Trust, to enter lease agreements and that he and Gregory entered a verbal agreement regarding the CRP land and payments. Donald asserted in his affidavit that he could not receive the payments because his "personal income level" had an adverse "effect on the amount of the CRP payments."

Carol, and Ruth (the Majority) as co-trustees. In his petition, Terry made allegations for breach of trust against the Majority as well as against Donald and Gregory in their individual capacities as co-trustees. He alleged that the Majority failed to act on Gregory's below market leases, his improper farming of CRP and non-irrigated land, and the improper assignments of CRP payments.[3] Terry claimed that he repeatedly asked Donald and Gregory for information and records regarding the Trust, including copies of Gregory's farm leases with the Trust, but his requests were denied. Further, Terry alleged the Majority held meetings without him and that they knew of the alleged violations but failed to act or remedy them.

[¶14.] Terry averred that Donald, as the Board's president, "refused to cooperate with the administration of the Trust, produced a fraudulent balance sheet" reflecting inaccurate values for the land, failed to renegotiate below market leases between the Trust and Gregory, and that he failed to inform the Farm Service Agency that Jim was no longer a trustee and could not sign the CRP contracts on behalf of the Trust. In Terry's view, these actions were serious breaches of trust that "resulted in a lack of cooperation among the [c]o-[t]rustees" which substantially impaired the Trust's administration.

[¶15.] Terry also brought claims against Gregory for the same conduct and further alleged that he housed cattle and equipment on Trust land without paying

---

3.     Terry asserts that Gregory farmed CRP land in violation of the CRP contract, placing the CRP contract in jeopardy. *See Mittelstadt v. Perdue*, 913 F.3d 626, 635–36 (7th Cir. 2019) (noting that CRP contracts can be terminated due to noncompliance with the contract's terms and conditions).

rent. In addition, Terry claimed Gregory owed the Trust back rent for farming land under a lease agreement with Monsanto Technology Department (Monsanto).[4]

[¶16.]     In January 2018, the Majority responded to Terry's allegations by filing a second petition for court supervision and approval of the Trust's commencement of civil action, seeking permission to bring claims against Terry for the March 2011 debt he owed the Trust. The petition alleged that the Trust, in September 2016, provided Terry with formal notice that he was in default under the terms of his Note. Rather than addressing his unpaid debt to the Trust, the Majority alleged Terry instead sued the co-trustees. The Majority also sought leave to assert a claim against Terry for unpaid rent. The parties engaged in discovery regarding these claims.

[¶17.]     In February 2018, the parties stipulated to a change of venue for the Trust supervision action, and the case was transferred from Codington to Minnehaha County. Then, in November 2018, the parties stipulated to transfer venue of this action to Roberts County.

[¶18.]     In March 2018, Terry paid the Note from his March 2011 debt in full to Dacotah Bank, which held the Trust's debt. Under the terms of the Note, however, Terry was required to reimburse the Trust directly. The Majority claimed that Terry lacked authority to unilaterally decide to "pay off" his Note by paying down the Trust's debts in this amount. Because Terry's payment included significant

---

4.     While the details of the Monsanto Lease are not fully disclosed in the record, Gregory claimed the lease was executed prior to his designation as co-trustee in 2016 and that he and Jim entered into an agreement to split the lease payment received from Monsanto and the grain produced. Terry took over this lease after 2016.

interest, which accrued to the Trust as income, it created a tax liability for each of the beneficiaries. Ordinarily the Trust would distribute funds to the beneficiaries to cover the tax liability, but due to a liquidity shortfall, the Trust lacked the necessary funds to do so. As a result, the Majority alleged that the Trust was required to secure a short-term loan to distribute funds to cover the tax obligations thereby incurring financing costs. In response, Terry argued the Trust had to secure various loans because of ineffective administration by the other co-trustees.

[¶19.] Because the validity and scope of Gregory's leases with the Trust were a continuing source of conflict, Gregory filed a declaratory judgment action in Roberts County on October 12, 2018, seeking "a declaration of the validity of the lease agreements, the term of the lease agreements, and a determination of the property covered by the lease agreements." On November 8, 2018, Gregory filed co-trustee's motion to dismiss individual claims against himself, seeking to dismiss four specific claims set forth in Terry's petition for court supervision.[5] Terry filed an answer, counterclaim, and third-party complaint on November 13, reasserting allegations he had made in his initial lawsuit that Gregory improperly farmed non-irrigated acres and housed cattle and equipment without paying rent. Terry contemporaneously filed a motion to consolidate the Trust supervision action and

5. The motion sought to dismiss, without prejudice, claims for the following: (1) an order seeking repayment of approximately $2 million to the Trust for "the difference between [Gregory's] Grant and Roberts county leases and the [alleged] fair market value" for which the leases could have been rented; (2) an order terminating Gregory's "interest in the Monsanto's Lease" and requiring him to reimburse the Trust for any benefit he received; (3) an order directing Gregory to pay back "rent for housing his cattle and storing his equipment" on the land; and (4) and an order requiring Gregory "pay back rent for the non-irrigated acres" he farmed.

Gregory's declaratory judgment action.[6]  On November 19, 2018, Donald, Judy, Ruth, and Carol answered and counterclaimed, seeking a declaration whether Gregory's lease agreements were valid and in full effect.

[¶20.]        In December 2018, Gregory filed a motion to dismiss Terry's counterclaim and third-party complaint, alleging Terry lacked authority under the terms of the Second Modification to pursue claims against him on behalf of the Trust without permission from the co-trustees.  Terry subsequently sought permission from the other co-trustees pursuant to the Trust's terms but was denied authority to act on behalf of the Trust.  On January 23, 2019, all parties stipulated to granting, without prejudice, the following motions: (1) co-trustee's motion to dismiss individual claims against Gregory; and (2) Gregory's motion to dismiss Terry's counterclaim and third-party complaint.  The circuit court granted the parties' stipulation on January 29, 2019.

[¶21.]        Earlier that month, Gregory filed a motion for partial summary judgment regarding the termination date of his leases and whether he could farm non-irrigated corners.  Only Terry, in his capacity as co-trustee, opposed Gregory's motion for partial summary judgment.  By the lease terms, the leases would terminate December 1 of the year in which the Trust's real property became distributable or after 20 years from the commencement of the leases—whichever occurred first.  In Gregory's view, the Trust's real property would not become distributable, thus terminating the leases, until the last of the three brothers died or when the brothers agreed, in writing, to terminate the Trust.  Terry, however,

---

6.        The circuit court granted Terry's motion for consolidation in December 2018.

argued that Section 5.1.2 of the Second Modification, which authorized the co-trustees, by a super majority vote, to convey or distribute land, made the land distributable and thereby terminated Gregory's below market leases.

[¶22.]     Meanwhile, Terry, in his capacity as a beneficiary, filed a separate action in Roberts County against Gregory individually as a tenant and against Donald, Gregory, Carol, Judy, and Ruth as co-trustees. Terry alleged Gregory farmed non-irrigated acres in violation of his leases, resulting in the termination of the leases, and that the Majority committed a breach of trust in failing to pursue claims against Gregory for doing so. This action was later consolidated with the other Roberts County proceeding.

[¶23.]     A hearing on Gregory's motion for partial summary judgment was held on May 15, 2019. The circuit court orally denied Gregory's motion and indicated that, if requested, it would grant summary judgment to Terry on the same issues. Accordingly, Terry moved for partial summary judgment. An additional hearing was held on the motion on September 25, 2019. The circuit court denied Gregory's motion for reconsideration on his motion for partial summary judgment as it pertained to the non-irrigated acres and the termination dates for the leases, thereby affirming its earlier ruling. The circuit court granted Terry's motion for partial summary judgment, concluding that the terms of the Second Modification made the land distributable, thereby terminating Gregory's lease on December 1, 2016. The circuit court also held that Gregory could not farm the non-irrigated

acres under his lease with the Trust and entered orders to this effect on October 7, 2019.[7]

[¶24.]    Following the court's ruling, the co-trustees, excluding Gregory who abstained, voted to terminate Gregory's leases. Gregory then entered into negotiations with the Trust in an attempt to establish new leases. Gregory declined, however, to lease the land at fair market value. Donald, Carol, Judy, and Ruth approved a plan that authorized the co-trustees to seek new tenants, hoping to find new tenants that would pay fair market value. If any of the co-trustees found new tenants, the co-trustee was to submit a proposal to the Board. In the event new tenants could not be secured, Gregory would be able to enter into new leases with the Trust at below fair market value. Terry and Gregory voted against this action, and Janet was absent.

[¶25.]    The Trust entered into leases with new tenants in early 2020, which more than doubled the rent previously received by the Trust. The new leases increased the Trust's rental income by approximately $135,000 per year. Terry claims he and Janet were the only co-trustees who sought new tenants and alleges that but for his successful efforts, Gregory's leases would have continued until 2030.

---

7.    The circuit court determined that Gregory's lease with the Trust did not allow him to farm non-irrigated corners but left open the possibility that Gregory had entered into a separate agreement with the Trust or Jim to farm the non-irrigated corners. The circuit court stated that "I don't conclude that the mere fact that [Gregory] was farming the corners constitutes a breach of this lease . . . [b]ut it's the court's determination that the leases are unambiguous and that they only authorize . . . the irrigated acres[.]" Whether Gregory could farm the non-irrigated corners was a question of fact left open for trial.

[¶26.]      In late 2019 and early 2020, the co-trustees discussed various plans to terminate the Trust and distribute its assets.  Terry, believing it necessary to foster a settlement, hired a land appraisal company to appraise the land.  However, the Majority claimed that Terry incurred the appraisal cost to the detriment of the Trust given that the Majority did not want an appraisal until after all of the parties agreed on a distribution plan.  Nonetheless, the Majority proposed one plan while Terry and Janet proposed another.  The Majority rejected Terry and Janet's proposal and approved their proposal to distribute the land instead.  Terry claimed the Majority breached their fiduciary duties by approving the plan and filed a motion for a preliminary injunction to stop the Majority's plan for distribution of the Trust's land.  Terry argued that an injunction should be issued in light of his pending petition to remove the Majority as co-trustees.

[¶27.]      The circuit court scheduled a hearing for April 9, 2020, on Terry's request for a preliminary injunction.  Although the parties filed extensive briefs prior to the hearing, they ultimately negotiated a settlement on April 6 and signed a formal settlement on May 28, 2020.  As part of the settlement, the Trust and all co-trustees executed global, mutual releases.  Terry reserved the right to present his application for attorney fees to the court and received an assignment of the Trust's claim against Maxine.[8]  The settlement agreement granted Terry and Janet certain

---

8.      Prior to Jim's death, Jim and Maxine used Trust funds to purchase a commercial lot, which they titled in their names.  After Jim's death, Maxine sold the lot and retained the sale proceeds.  The Trust did not own the real property but was responsible for the debt.  The co-trustees voted to forgive the debt and declined to sue Jim's estate or Maxine.  Terry disagreed with

(continued . . .)

parcels of real property from the Trust as distributions of their beneficial interests. Both Terry and Janet resigned as co-trustees. The Majority remained co-trustees and Terry's petition for their removal was dismissed.

[¶28.] On August 18, 2020, Terry filed a motion requesting $389,121.12 for attorney fees, expenses, sales tax, and interest. Terry claimed he was entitled to attorney fees under several theories. First, Terry argued he was entitled to attorney fees under SDCL 55-3-13 because he was a co-trustee. He claimed the attorney fees were "properly incurred" when he petitioned to remove the co-trustees under SDCL 55-3-20.1[9] and SDCL chapter 55-1A.[10] Alternatively, if the court found Terry's expenses were not properly incurred under the first sentence of SDCL 55-3-13, Terry argued his actions were of "actual" benefit to the Trust under the second sentence of the statute. Second, Terry claimed he was entitled to attorney fees as a beneficiary under SDCL 15-17-38.

[¶29.] The Majority opposed Terry's motion for attorney fees under both theories. They maintained that the terms of the Trust, specifically Section 5.1.1.3, required Terry to obtain authorization from a majority of co-trustees before acting

---

(. . . continued)

this decision and reserved the right to sue Maxine for the value of the commercial lot and agreed to cover all the costs of litigation against Maxine.

9. Terry contends that SDCL 55-3-20.1 authorized him to petition to remove a co-trustee in addition to procedures or powers established in the Trust. Therefore, he claims that the fees generated by his petition were properly incurred.

10. SDCL chapter 55-1A enumerates the powers and duties of trustees, including that a trustee may employ attorneys "to advise or assist himself in the performance of his duties[,]" *see* SDCL 55-1A-31, may defend or prosecute actions to protect trust assets, and may advance personal funds to protect the trust which may later be reimbursed out of trust assets for the advances.

on behalf of the Trust. The Majority also argued that Terry was not entitled to attorney fees in either capacity because his actions did not provide a material benefit to the Trust.

[¶30.] The circuit court heard the parties' arguments on September 9, 2020. Following the hearing, the circuit court issued an incorporated memorandum opinion denying Terry's motion for attorney fees in its entirety and entered an order and findings of fact and conclusions of law on December 30, 2020. The circuit court analyzed the provisions of SDCL 55-3-13 and determined that Terry was not entitled to attorney fees because he did not incur the fees under the circumstances allowing for such in this statute, i.e., by acting under the authority of the governing Trust instrument, a court order, or the powers set forth in SDCL chapter 55-1A. In applying these criteria, the court first considered whether Terry was properly exercising his powers as described in the governing instrument of the Trust and noted the provision requiring a majority of co-trustees to approve of all legal services. The court concluded that because Terry did not receive majority co-trustee approval for the legal services for which he sought compensation in this action, Terry's actions were ultra vires because he was not acting within the power granted to co-trustees to acquire the legal services for which he now requests fees.

[¶31.] The circuit court also determined that while Terry had the authority to petition for the removal of co-trustees pursuant to SDCL 55-3-20.1, this statute was not contained within SDCL chapter 55-1A, and he, therefore, was not exercising a power that would entitle him to reimbursement for attorney fees under SDCL 55-3-13. As to the provision in SDCL 55-3-13 entitling a trustee to receive repayment of

expenditures, even if unlawful, if they produced an actual benefit to the Trust, the court determined that Terry's hiring of attorneys resulted in "some meager benefits for the estate" but not "to the level necessary to justify his ultra vires conduct."

[¶32.] Because Terry also commenced a separate suit as a beneficiary, the circuit court addressed whether he could recover his attorney fees under SDCL 15-17-38. The court looked to estate principles for guidance and concluded that Terry was not entitled to attorney fees under the statute because his actions did not materially benefit the Trust. The circuit court held that Terry's actions did not result in the removal of co-trustees and were not the primary reason the Trust secured higher rent on the land previously leased by Gregory.

[¶33.] Terry appeals, raising one issue which we restate as follows:

> I. Whether the circuit court abused its discretion in denying Terry's application for attorney fees as a co-trustee under SDCL 55-3-13 and as a beneficiary under SDCL 15-17-38.

**Standard of Review**

[¶34.] "We review a trial court's ruling on the allowance or disallowance of costs and attorney fees under an abuse of discretion standard." *In re Heupel Fam. Revocable Tr.*, 2018 S.D. 46, ¶ 34, 914 N.W.2d 571, 580 (quoting *Johnson v. Miller*, 2012 S.D. 61, ¶ 7, 818 N.W.2d 804, 806). "An abuse of discretion 'is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary and unreasonable.'" *In re Tr. Fund of Baumgart*, 2015 S.D. 65, ¶ 27, 868 N.W.2d 568, 575–76 (quoting *Gartner v. Temple*, 2014 S.D. 74, ¶ 7, 855 N.W.2d 846, 850). An abuse of discretion occurs when discretion is "exercised to an end or purpose not justified by, and clearly against

reason and evidence." *In re Estate of Watson*, 2003 S.D. 142, ¶ 10, 673 N.W.2d 60, 62 (quoting *Divich v. Divich*, 2003 S.D. 73, ¶ 7, 665 N.W.2d 109, 112). "[B]y definition, a decision based on an error of law is an abuse of discretion." *Credit Collection Servs., Inc. v. Pesicka*, 2006 S.D. 81, ¶ 5, 721 N.W.2d 474, 476 (alteration in original) (quoting *State v. Vento*, 1999 S.D. 158, ¶ 5, 604 N.W.2d 468, 469).

[¶35.] "We review questions of fact under the clearly erroneous standard of review." *In re Florence Y. Wallbaum Revocable Living Tr. Agreement*, 2012 S.D. 18, ¶ 33, 813 N.W.2d 111, 119 (quoting *Weekley v. Prostrollo*, 2010 S.D. 13, ¶ 11 n.3, 778 N.W.2d 823, 827 n.3). "[W]e review purely legal questions de novo, giving no deference to the [circuit] court's findings." *Baumgart*, 2015 S.D. 65, ¶ 26, 868 N.W.2d at 575 (second alteration in original) (quoting *In re Estate of Moncur*, 2012 S.D. 17, ¶ 10, 812 N.W.2d 485, 487). Likewise, we review "[q]uestions of statutory interpretation and application" de novo. *Deadwood Stage Run, LLC v. S.D. Dep't of Revenue*, 2014 S.D. 90, ¶ 7, 857 N.W.2d 606, 609 (quoting *Argus Leader v. Hagen*, 2007 S.D. 96, ¶ 7, 739 N.W.2d 475, 478).

**Analysis and Decision**

[¶36.] "South Dakota adheres to the 'American Rule' for awarding attorney's fees." *Long v. State*, 2017 S.D. 78, ¶ 10, 904 N.W.2d 358, 362 (quoting *Rupert v. City of Rapid City*, 2013 S.D. 13, ¶ 32, 827 N.W.2d 55, 67). Pursuant to this rule, each party pays their own attorney fees, unless one of two exceptions apply. *Id.* First, a party may recover attorney fees when a "contractual agreement between the parties" entitles the prevailing party to attorney fees. *Id.* (quoting *Eagle Ridge Ests. Homeowners Ass'n, Inc. v. Anderson*, 2013 S.D. 21, ¶ 28, 827 N.W.2d 859, 867).

Second, a party may recover attorney fees when an award is specifically authorized by statute. *In re S.D. Microsoft Antitrust Litig.*, 2005 S.D. 113, ¶ 29, 707 N.W.2d 85, 98 (citing *Crisman v. Determan Chiropractic, Inc.*, 2004 S.D. 103, ¶ 26, 687 N.W.2d 507, 513). In determining whether attorney fees are authorized by statute, "[t]his Court has rigorously followed the rule that authority to assess attorney fees may not be implied, but must rest upon a clear legislative grant of power." *Long*, 2017 S.D. 78, ¶ 10, 904 N.W.2d at 362 (alteration in original) (quoting *Rupert*, 2013 S.D. 13, ¶ 32, 827 N.W.2d at 67). "The party requesting an award of attorneys' fees has the burden to show its basis by a preponderance of the evidence." *Stern Oil Co., Inc. v. Brown*, 2018 S.D. 15, ¶ 44, 908 N.W.2d 144, 157 (quoting *Arrowhead Ridge I, LLC v. Cold Stone Creamery, Inc.*, 2011 S.D. 38, ¶ 25, 800 N.W.2d 730, 737).

[¶37.]     Thus, Terry bears the burden of establishing his entitlement to attorney fees. He acknowledges that the parties have not entered into a contract authorizing such an award and instead asserts that he is entitled to recover attorney fees and litigation expenses in his capacity as a co-trustee under SDCL 55-3-13 and as a beneficiary under SDCL 15-17-38.

***Reimbursement as co-trustee per SDCL 55-3-13***

[¶38.]     SDCL 55-3-13 provides that:

> A trustee, including a former trustee, is entitled to the repayment, out of the trust property, of all expenses actually and properly incurred by the trustee in the performance of the trustee's duties. The trustee is entitled to the repayment of even unlawful expenditures, if the expenditures were productive of actual benefit to the estate. Expenses in performance of the trust include those expenses actually and properly incurred in the exercise of the trustee's powers as described in the governing instrument, in any applicable court order, or in chapter 55-1A. A former trustee is entitled to the repayment, out of trust

property, of all expenses actually and properly incurred by the former trustee in the defense of proceedings relating to the performance of the trustee's duties to the same extent as the current trustee is entitled to repayment.

[¶39.]     In applying this statute, the circuit court concluded that because Terry's actions were ultra vires, he could not "properly incur" attorney fees under the first sentence. However, the circuit court determined that Terry may recover attorney fees under the second sentence of the statute if his expenditures were of actual benefit to the Trust. Although the circuit court acknowledged that Terry's actions led to a rental increase, the court concluded that Terry's actions "had an essentially coincidental effect of creating some meager benefits for the Trust" and did "not rise to the level necessary to justify reimbursement[.]" Therefore, the circuit court determined that Terry could not recover his attorney fees under the second sentence of SDCL 55-3-13. The circuit court also reviewed the third sentence of SDCL 55-3-13 and determined that it provided an exhaustive list rather than examples or categories of powers exercised by a trustee for which expenditures are reimbursable. It then concluded that Terry's expenses were not incurred in performance of powers that satisfied the specific criteria delineated in the text of the statute because: (1) he lacked authority to hire counsel without majority approval under the provisions of the Trust; (2) his fees were not authorized by court order; and (3) his actions were not an exercise of the powers described in SDCL chapter 55-1A.

[¶40.]     Terry claims the circuit court abused its discretion in determining that his attorney fees were not actually and properly incurred under the first and third sentence of SDCL 55-3-13. He alleges the first and third sentences cannot be read

in isolation from one another and that the use of the term "include" in the third sentence informs the first sentence by providing examples of the types of powers for which the exercise thereof entitles a trustee to obtain reimbursement for expenses that are actually and properly incurred. In his view, because he had the authority to petition for the removal of a co-trustee under SDCL 55-3-20.1, his fees were actually and properly incurred. Terry further argues that the Declaration of Trust did not preclude him from exercising any of the powers found in chapter 55-1A. Specifically, Terry points to Article 10 which provides that a "Trustee shall have the power and authority to do any act or thing reasonably necessary or advisable for the proper administration and distribution of the trusts created by this instrument." In Terry's view, it would be counterintuitive to require a co-trustee to seek majority approval to protect or defend the Trust when a majority of co-trustees are alleged to have violated the Trust's terms.

[¶41.]     In the alternative, Terry argues he is entitled to attorney fees under the second sentence of SDCL 55-3-13 because, even if his expenses were unlawful expenditures, his actions were of actual benefit to the Trust. Terry reasons that his actions led the Trust to attain higher rental income and to receive CRP payments, both of which he asserts were of actual benefit.

[¶42.]     The Majority responds that Terry's attorney fees were not actually and properly incurred under the first sentence of SDCL 55-3-13 and that the term "include" in the third sentence introduces an exhaustive list.[11] The Majority thus

---

11. The Majority also asserts that this Court should not even consider the question whether the word "include" provides "examples rather than

(continued . . .)

argues that Terry's fees were improper pursuant to the Trust's terms and because SDCL 55-3-20.1, governing grounds for removal of a co-trustee, is not included in the third sentence. The Majority also relies on the legislative history of SDCL 55-3-13, noting that the third sentence was added to the statute in 2014. The Majority reasons that "[i]f the 2014 Amendment did not alter or limit the first sentence of SDCL 55-3-13, then it accomplished nothing, and the third sentence is superfluous." Finally, the Majority claims the Trust did not receive an actual benefit from Terry's actions, and that Terry therefore cannot recover attorney fees under the second sentence of SDCL 55-3-13.

[¶43.]     "We begin our interpretation of a statute with [an analysis of] its plain language and structure." *Puetz Corp. v. S.D. Dep't of Revenue*, 2015 S.D. 82, ¶ 16, 871 N.W.2d 632, 637 (citing *State ex rel. Dep't of Transp. v. Clark*, 2011 S.D. 20, ¶ 10, 798 N.W.2d 160, 164). "Words and phrases in a statute must be given their plain meaning and effect. When the language in a statute is clear, certain, and unambiguous, there is no reason for construction, and this Court's only function is

---

(. . . continued)

limitations" because "Terry never argued to the [c]ircuit [c]ourt that the third sentence of SDCL 55-3-13 merely provided categories of a trustee's authority to incur reimbursable legal fees." Although the circuit court did not define the term "include," the interpretation of this term is simply part of the larger question that was raised and preserved—whether the third sentence in SDCL 55-3-13 provides an exhaustive list. Further, based on our review of the record, while the parties' prehearing briefing before the circuit court did not raise the issue, it was squarely placed before the circuit court during argument at a motions hearing. Moreover, after the circuit court adopted the Majority's view that the third sentence of SDCL 55-3-13 is exhaustive rather than illustrative in its memorandum decision, Terry filed findings of fact and conclusions of law objecting to the circuit court's interpretation of SDCL 55-3-13.

to declare the meaning of the statute as clearly expressed." *Id.* (quoting *Clark*, 2011 S.D. 20, ¶ 5, 798 N.W.2d at 162).

[¶44.]     In regard to whether Terry's expenses were actually and properly incurred, we examine the first and third sentence in tandem.  Terry alleges that the third sentence of SDCL 55-3-13 merely provides examples of actions actually and properly incurred and that actions taken under SDCL 55-3-20.1 are considered proper expenditures.  He claims that SDCL 55-3-20.1 vests him, as a co-trustee, with independent authority to challenge the actions of the other co-trustees.[12]  This argument, however, fails to address the provisions of the Trust requiring majority approval from the co-trustees in order to procure legal services.  An act is ultra vires when it is unauthorized or "beyond the scope of power allowed or granted." *Ultra Vires*, *Black's Law Dictionary* (11th ed. 2019); *see Heupel*, 2018 S.D. 46, ¶ 35, 914 N.W.2d at 580 (noting that action taken by a party ultra vires is an action taken "without authority"); *Ultra vires*, 9A Fletcher Cyc. Corp. § 4547 (stating that "acts

---

12.     SDCL 55-3-20.1 provides in relevant part:
    [A] cotrustee . . . may request the court to remove a trustee, or a trustee may be removed by the court on the court's own initiative.
    In addition to the powers otherwise granted the court, the court may remove a trustee if:
    (1) The trustee commits a serious breach of trust;
    (2) Lack of cooperation among co-trustees substantially impairs the administration of the trust;
    (3) Because of unfitness, unwillingness, persistent failure of the trustee to administer the trust effectively, the court determines that removal of the trustee best serves the interests of the beneficiaries . . . .
    Pending a final decision on a request to remove a trustee, the court may order such appropriate relief as may be necessary to protect the trust property or the interests of the beneficiaries.

beyond or in excess of the authority of the corporation" are ultra vires). Without approval, Terry's act of procuring legal fees was ultra vires, and thus not "properly incurred in the exercise of the trustee's powers," *see* SDCL 55-3-13,[13] regardless of whether he had independent authority to challenge the co-trustees under SDCL 55-3-20.1.

[¶45.] Similarly, Terry is not entitled to attorney fees for actions taken under the authority of chapter 55-1A when the incurring of such fees is otherwise precluded or limited by the governing Trust instrument. SDCL 55-1A-1 provides that "[a]ny or all of the powers enumerated in this chapter apply to any trust which is governed by South Dakota law *unless* the instrument specifically excludes any or all of the powers provided in this chapter." (Emphasis added.) Although Terry suggests that the broad provision in Article 10 of the Trust instrument that a "Trustee shall have the power and authority to do any act or thing reasonably necessary or advisable for the proper administration and distribution of the trusts[,]" gives him authority to retain the services of an attorney to pursue legal action, the Trust's terms are clear. In the modifications agreed upon by the beneficiaries and approved by the court, Section 5.1.1 requires that a majority of co-trustees must, pursuant to Section 5.1.1.3, approve all legal services. These more specific terms of Section 5.1.1 control over the general powers afforded in Article 10.

---

13. SDCL 55-3-13 has been amended twice since its inception—once in 2014 and again in 2020. The first amendment added the statute's third sentence. In 2020, the statute was amended to allow a former trustee to recover attorney fees to the same extent as a current trustee. The amendment also changed the reference to the expenses being "incurred by the trustee in the performance *of his or her trust*" to "in the performance of *the trustee's duties*." SDCL 55-3-13.

*See, e.g., Bunkers v. Jacobson*, 2002 S.D. 135, ¶ 15, 653 N.W.2d 732, 738 (noting

that when interpreting the intent of the parties in a contract case, "the more specific

clauses are deemed to reflect the parties' intentions"). Moreover, the authority to

seek removal of a trustee under SDCL 55-3-20.1 is subject to the directive in SDCL

chapter 55-3 that requires a trustee to "follow all the directions of the trustor given"

at the time of the creation of the trust or as subsequently modified. SDCL 55-3-5.

[¶46.]      Because Terry incurred legal fees without majority approval by the co-

trustees, his attorney fees were not "properly incurred." Notably, both the first and

third sentences in SDCL 55-3-13 contain this requirement. Therefore, we need not

determine whether "include" introduces an exhaustive or non-exhaustive list in the

third sentence of SDCL 55-3-13 because regardless of the source of the power Terry

was exercising when he initiated the legal actions at issue, he could not "properly

incur" the related attorney fees without the majority approval required under the

Trust instrument.

[¶47.]      However, Terry may recover attorney fees under the second sentence of

SDCL 55-3-13, if the unlawful expenditures were of actual benefit to the Trust. A

trustee who exceeds his or her authority in incurring an expense may be entitled "to

indemnity to the extent of the value of the benefit conferred." Restatement (Second)

of Trusts § 245 cmt. d. (1959). "[A] benefit may result from an increase in the rental

value of the trust property as well as from an increase in the sales value." *Id.* at

§ 245 cmt. e.

[¶48.]      Terry asserts that he discovered Gregory's below market leases and

issues surrounding the CRP payments. He argues that his actions were of actual

benefit to the Trust in that through his efforts, the Trust terminated its below market leases with Gregory and entered new leases, doubling the Trust's yearly rental income. Further, Terry points out that the CRP payments were redirected back to the Trust.

[¶49.] The circuit court disagreed, concluding that Terry's actions did not create an actual benefit to the Trust. The court stated that:

> Terry's actions in hiring the attorneys were not "productive of actual benefit to the estate." Instead, Terry's purpose in hiring the attorneys was to serve his own interests. Although there was some benefit to the Trust, such as through rental income increase, these benefits do not rise to the level necessary to justify reimbursement of Terry's legal fees and expenses. Instead, the [c]ourt concludes that Terry's own efforts on his behalf had an essentially coincidental effect of creating some meager benefits for the Trust.

Based on our review of the record, however, we determine that the circuit court erred as a matter of law in its application of the second sentence of SDCL 55-3-13. *See Credit Collection Servs., Inc.*, 2006 S.D. 81, ¶ 5, 721 N.W.2d at 476 ("[A]n error of law is an abuse of discretion."). Notably, in finding the benefit to the Trust to be insufficient, the circuit court referred, in its memorandum opinion, to it not rising "to the level necessary to justify [Terry's] ultra vires conduct in the hiring of attorneys." This ignores the premise of this statutory provision which assumes the trustee was acting unlawfully. The statute nevertheless directs that a trustee is "entitled" to the repaying of the expenditures if they produced an actual benefit to the estate. Here, the circuit court specifically found that Terry's actions created at least some benefit to the Trust. Under the plain language of the statute, Terry is entitled to reasonable attorney fees expended for his actions as a co-trustee that

were "productive of an actual benefit" to the Estate, even though he incurred them without proper Trust authorization.

[¶50.] We further determine that the circuit court clearly erred in some of its factual findings underlying its determination that Terry was not entitled to attorney fees. There is no dispute that the rental income under the new leases more than doubled the prior payments, resulting in approximately $135,000 in additional income for the Trust each year.[14] However, the circuit court entered findings in line with the Majority's argument that the increase in rental income was the result of "various actions" such as Gregory's declaratory action to determine the validity of his own leases and the Majority's answer and counterclaim. Although the circuit court found that the issue regarding the termination date of the leases was first raised by Gregory in his summary judgment motions, and not "predominately the result of Terry's efforts," we conclude, after reviewing the record, that these findings are clearly erroneous to the extent they failed to properly credit Terry's role in securing the increased rental payments. Importantly, Gregory and the Majority's actions occurred a year *after* Terry filed his initial petition seeking judicial supervision of the Trust and removal of co-trustees for issues involving Gregory's

---

14. Terry submits that if Gregory's below market leases continued until 2030, the result would have been an aggregate loss of more than $1 million in rent alone. Using the $135,000 rental increase as an example of what the Trust could have received for those ten crop years, Terry claims Gregory's below market leases deprived the Trust of $1.35 million in income. He claims the income could have been distributed to the beneficiaries through the years totaling "$270,000 for beneficiaries with a 20% interest and $135,000 for beneficiaries with a 10% interest."

leases and potential misconduct surrounding the CRP payments. Further, Terry was the only co-trustee to oppose Gregory's arguments in the declaratory action.

[¶51.]    This opposition ultimately resulted in a decision by the court rejecting Gregory's argument that the leases would not terminate until the last of the three brothers died or when the brothers voted to terminate the Trust. Instead, the circuit court ultimately accepted Terry's argument, determining that the terms of the Second Modification made the land distributable upon certain conditions thereby terminating Gregory's below market leases.[15]

[¶52.]    Because the record and the circuit court's findings reveal that Terry incurred attorney fees that were productive of actual benefit to the Trust, the circuit court abused its discretion in awarding Terry nothing in attorney fees. Accordingly, we reverse and remand for the circuit court to determine from the record the amount of attorney fees incurred that were productive of an actual benefit to the Trust. Furthermore, in determining a reasonable attorney fee award to Terry, the court should consider the standard factors established in *City of Sioux Falls v. Kelley*, 513 N.W.2d 97, 111 (S.D. 1994), which guide circuit courts in the exercise of

---

15.    We further note, that the circuit court also placed undue emphasis on the fact that Terry was acting in his own interest. In our recent decision, *In re Petersen Land Trust*, 2022 S.D. 72, 2022 WL 17173661, we determined that "[t]he plain fact that a party who is a beneficiary derives a benefit from successful litigation involving a trust or will should not detract from a circuit court's focus upon the benefit *to the estate*." *Id.* ¶ 37. Thus, while a court may take this fact into consideration in determining the amount of fees awarded, it is not a basis for denying fees altogether.

their discretion when awarding fees.[16]

### *Reimbursement as beneficiary per SDCL 15-17-38*

[¶53.] In his capacity as a beneficiary, Terry brought a separate action against Gregory for farming non-irrigated Trust land in violation of his leases and against the co-trustees for failing to pursue claims against Gregory for this conduct. In Terry's view, he is entitled to an award of attorney fees pursuant to SDCL 15-17-38, which provides, in relevant part, that "[t]he court may award attorneys' fees from trusts administered through the court . . . ." Here, the circuit court determined that Terry's petition for removal did not materially benefit the Trust as the co-trustees were never removed and because the termination of the leases and the increased rent under the new leases were the "result of a myriad of considerations involving the evolving relationships between the

---

16. Those factors include:
> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
> (3) the fee customarily charged in the locality for similar legal services;
> (4) the amount involved and the results obtained;
> (5) the time limitations imposed by the client or by the circumstances;
> (6) the nature and length of the professional relationship with the client;
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
> (8) whether the fee is fixed or contingent.

*Kelley*, 513 N.W.2d at 111.

beneficiaries/trustees." The court also held, without further explanation, that the settlement negotiation primarily benefited Terry and Janet rather than the Trust.

[¶54.] As a general rule, this Court will not decide an issue when doing so "will have no practical legal effect upon an existing controversy." *Skjonsberg v. Menard, Inc.*, 2019 S.D. 6, ¶ 14, 922 N.W.2d 784, 788 (quoting *Sullivan v. Sullivan*, 2009 S.D. 27, ¶ 11, 764 N.W.2d 895, 899). Here, all of Terry's litigation efforts benefitting the Trust were also made in his concomitant role as a co-trustee. Above, we held that Terry is entitled to attorney fees for those efforts under SDCL 55-3-13. Terry makes no argument that his actions as a beneficiary would entitle him to an award of attorney fees separate from or greater than what he would receive under SDCL 55-3-13 as a co-trustee. Therefore, any determination on the issue of attorney fees under SDCL 15-17-38 would have no practical legal effect on the outcome of the controversy before us, and we need not address this issue.

## Conclusion

[¶55.] Terry is entitled to attorney fees under SDCL 55-3-13 for his actions as a co-trustee which were productive of actual benefit to the Trust. The circuit court shall determine on remand, in a manner consistent with this opinion, the amount of attorney fees Terry may recover.

[¶56.] We reverse and remand for further proceedings consistent with this opinion.

[¶57.] JENSEN, Chief Justice, and SALTER and DEVANEY, Justices, and GERING, Circuit Court Judge, concur.

[¶58.]    GERING, Circuit Court Judge, sitting for MYREN, Justice, deeming himself disqualified and did not participate.